UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

MAYNARD M. ARCHER,

                Petitioner,

    -against-

SUSAN A. CONNELL, Superintendent,
Oneida Correctional Facility

                Respondent.

---------------------------------------------------------------x

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION AND ORDER**

06-CV-2961 (ARR) (LB)

ROSS, United States District Judge:

    In 2004, petitioner Maynard M. Archer was convicted, following a jury trial, of burglary in the third degree (a class D felony) and four class A misdemeanors in connection with an incident which took place on March 5, 2003, at a Queens school. After exhausting his direct appeal, petitioner commenced this action by filing a pro se petition for a writ of habeas corpus pursuant to 42 U.S.C. § 2254. For the reasons set forth below, this petition for a writ of habeas corpus is denied and this action is dismissed.

### BACKGROUND

    In the early morning hours of March 5, 2003, police officers responded to a burglar alarm at the Torah Academy for Girls, located at 444 Beach Sixth Street in Far Rockaway, New York. There, they discovered petitioner, astride a bicycle and leaning on an open door at or near the rear of the school, holding a portable electric heater. Petitioner was arrested and a search of his person uncovered tools, several glassine envelopes, a pipe containing cocaine residue and a credit card bearing the name "Mendel Lowy." Petitioner was subsequently indicted on six counts: burglary in the third degree, possession of burglar's tools, petit larceny, criminal possession of

stolen property in the fourth and fifth degrees, and criminal possession of a controlled substance in the seventh degree.

On July 13, 2003, Judicial Hearing Officer ("JHO") Thomas A. Demakos[1] commenced a Mapp/Dunaway/Huntley hearing on petitioner's motions to suppress (1) the physical evidence recovered during the search and (2) statements which petitioner had made to the police shortly after his apprehension. At that hearing, New York City Police Officer Marianne Deserio testified concerning the events that culminated in petitioner's arrest. Deserio stated that she was patrolling the 101st Precinct in a marked car at around 4:40 a.m. on March 5, 2003, when she heard a burglar alarm sound approximately two blocks away (H. 4, 12).[2] Almost immediately thereafter, Deserio received a radio call from "central dispatch," reporting that a burglar alarm had been tripped on the "third floor perimeter" of 444 Beach Sixth Street (H. 5, 12).

Deserio immediately drove to that location – the site of a "Jewish school for girls" – which proved to be the source of the audible burglary alarm (H. 6). There, Deserio and her partner found petitioner, dressed in a yellow bubble jacket and a blue sweatshirt with the word "security" written across the front, standing by a door located either near or at the rear of the building (H. 6, 13). The door was held open both by a rock and by petitioner, who was "leaning on the door with his arm" (H. 7). Although the lighting was dim, both Deserio and her partner had flashlights and Deserio was able to see that petitioner was either standing astride or sitting on a bicycle (H. 13, 21) and holding a portable electric heater underneath his arm (H. 7, 13, 22).

---

[1]This court will take judicial notice that JHO Demakos, served as a distinguished Justice of the Supreme Court, Queens County, for twenty years before being forced to retire in 1999 at age 76 by New York State's mandatory retirement law. See www.nydailynews. com/archives/ ny_local/1999/11/29/1999-11-29_getting_benched_age_forces_v.html.

[2]Numbers preceded by the letter "H" denote pages in the transcript of the pre-trial suppression hearing. Numbers preceded by the letter "T" denote pages in the trial transcript.

Petitioner made no effort to flee and responded to Deserio's questions (H. 13). When she asked him what he was doing there, petitioner stated that he had found the door already open and had only "checked to see if anybody was inside" (H. 7). Petitioner also told the officers that he had "removed" the heater "from the trash" (H. 8). Although there was a "garbage receptacle" in the area (H. 14), Deserio did not credit petitioner's explanation and asked him for identification (H. 8). After petitioner complied, producing a "benefit card" bearing the name "Maynard Archer," Deserio arrested petitioner (Id.).

Petitioner was searched, then transported to the 101st Precinct. There, at around 6:00 a.m., Officer John Russo of the precinct's Detective Squad interviewed petitioner (H. 27-28). Russo brought petitioner into an interview room and told petitioner that he "was going to give him an opportunity to tell his side of the story" (H. 31). When petitioner indicated that he wanted to do so, Russo read petitioner his Miranda rights and had petitioner initial and sign a form acknowledging that he was waiving those rights (H. 31). Petitioner then gave a statement which Russo, at petitioner's request, recorded in writing (H. 34). In that statement, which was received in evidence at the hearing, petitioner stated that he had found the radiator in a dumpster by the school at around 4:30 a.m. Petitioner further stated that the door was already open, and that he had tripped the alarm when he went inside to ask the janitor if he could take the radiator.

At 7:45 a.m., approximately one and one-half hours after completing the statement, Russo realized that he had not asked petitioner about the credit card which had been recovered during the search (H. 37-38). Petitioner then gave a second statement, which Russo recorded on the same piece of paper as the first statement (H. 36). In that second statement, petitioner stated that he had found the credit card at a Long Island Railroad station two weeks prior to his arrest, but had never used it.

3

Although petitioner elected to represent himself at the hearing and trial, the Legal Aid Society attorney who was assigned to assist him at both proceedings was permitted to make objections throughout the hearing (H. 5). Petitioner conducted a thorough cross-examination of both witnesses, though that cross-examination was regularly interrupted by objections, many of which were sustained. Following the testimony, petitioner made his argument in favor of suppression, asserting that Miranda v. Arizona, 384 U.S. 436 (1965), required that warnings be read immediately upon arrest and dictated that physical evidence recovered before the warnings be suppressed (H. 46-47). Even though this argument evinced a misunderstanding of Miranda, JHO Demakos did not cut petitioner off, but permitted him to continue until petitioner stated, "[T]hat is all I have to say" (H. 49). The prosecutor did not make any argument herself, but asked the JHO to inquire if petitioner "would like to make an argument regarding the Mapp issue that is before the Court" (H. 49). JHO Demakos declined to do so, saying:

> I have given him every opportunity to argue, okay, whatever he
> wants to argue with me on the law, he can do so. You don't have
> to remind him (H. 49).

Petitioner did not take issue with this statement, and later expressed satisfaction with the way he had been treated at the hearing, telling JHO Demakos, "I want you as my trial judge" (H. 50-51).

On September 9, 2003, JHO Demakos issued his findings of facts and conclusions of law, crediting Deserio's and Russo's testimony and recommending that petitioner's suppression motions be denied. The JHO concluded that Deserio had probable cause to arrest petitioner, that the property recovered from petitioner's person was seized incidental to a lawful arrest, that the statements petitioner made to Deserio were spontaneous and not in response to police interrogation, and that the statements given to Russo were knowingly, intelligently and voluntarily made following petitioner's waiver of his Miranda rights. On September 15, 2003,

4

Justice Joseph Anthony Grosso adopted JHO Demakos's findings and conclusions, and denied petitioner's motions to suppress the physical evidence and the statements.

### The Trial

In November 2003, petitioner went on trial before Justice Daniel Lewis and a jury. Both Deserio and Russo were called as witnesses for the prosecution and gave testimony which was largely consistent with their testimony at the hearing.[3] During the course of Deserio's testimony, the prosecutor sought to introduce into evidence the items which were taken from petitioner at the time of his arrest.

Assistant District Attorney ("ADA") Marnie Lobel succeeded in moving most of the items into evidence, but had considerable difficulty introducing the heater. Deserio initially testified that she recognized the heater which the prosecutor sought to introduce as the heater which petitioner had been carrying on the night of his arrest, and that it was "in the same or substantially the same condition" as it had been at the time of petitioner's arrest (T. 337). She claimed to recognize the heater, in part, because of a tape bearing a unique voucher number and a "peddler seal" which she herself had affixed to it (T., 338, 340). However, when asked by the prosecutor to compare the number on the seal to the number recorded in her paperwork, Deserio discovered that they were not the same (T. 346).

Deserio was unable to explain the discrepancy in the numbers. Instead, she could only speculate that someone at the Property Clerk's Office had "put a new number on it" (T. 350).

---

[3]Deserio's trial testimony differed from her hearing testimony in one notable respect. At trial, Deserio testified that she and her partner had been drawn to the school by the audible alarm alone (T. 331), and had not received the radio call from Central Command until four or five minutes after she stopped petitioner (T. 488). In addition, Deserio testified that she and her partner had originally arrived at the school around 4:30 a.m. (T. 487). This contradicted her hearing testimony, in which she had stated that she and her partner had arrived at the school around 4:40 a.m. and in response to a radio call.

Although Deserio claimed that she could still identify the heater by the voucher number, which appeared both on the piece of tape she had affixed it and on the property tag (T. 346-49), the court refused to accept the heater into evidence (T. 349).

Matters were further complicated when, after the lunch break, both ADA Lobel and Deserio produced newly discovered evidence with respect to the heater. First, prior to the start of the afternoon session, the prosecutor advised the court that, over the break, she had received "a property clerk's invoice for the heater which contains an alteration and signature over the peddler seal number that is on the voucher" (T. 385). Then Deserio, who had previously testified that she had not recorded the serial number of the heater (T. 345), testified that she had, in fact, recorded it on her complaint report work sheet (T. 392). However, while the number recorded on that document – 21310 – was the same as the serial number on the heater (T. 392-93), it differed slightly from the serial number recorded on the complaint report itself: 2B10 (T. 394-96). Although Deserio testified that the report had been typed by a Police Administrative Assistant reading from Deserio's complaint report work sheet (T. 394), and implied that the discrepancy was merely a typographical error, the court still declined to admit the heater into evidence (T. 397). The court stated, inter alia:

> The problem I have right now is that as far as the Court is
> concerned and the record before me . . . no one has explained the
> different peddler numbers (T. 399).

Thereafter, the prosecutor called Marcelino Garcia, the 101st Precinct's Evidence and Property Control Specialist, to testify about the discrepancy in the peddler seals. Garcia recalled that on March 6, 2003, while preparing to transfer the heater to the Queens Property Clerk's Office, he noticed that the peddler seal was missing (T. 542-43). Knowing that the Queens Property would not accept the item without the seal (T. 543), Garcia affixed a new seal (T. 545).

He then altered the voucher by crossing out the old number, adding the new number and initialing the change (T. 543-44). Garcia could not recall whether he had notified Deserio of the change so that she could conform her copy of the voucher (T. 547).

The prosecutor also adduced testimony from Rabbi Meyer Weitman, an administrator at the Torah Academy for Girls. Weitman testified that in February 2003, upon learning that a heating unit on the third floor of the school had malfunctioned, he had purchased six "electric radiators" from Home Depot (T. 590-91, 594). Weitman had not taken inventory following March 5, 2003 (T. 596), and could not be certain that the heater which the prosecutor sought to introduce in evidence was one of the six radiators (T. 612). However, he testified that the heater the prosecutor sought to introduce was "similar, exact to what [he] purchased" (T. 592), in that it was "the same brand, same size color shape" (T. 592). In addition, he noted that it was decorated with several stickers "similar to the kind that children use in a classroom" (T. 593). After hearing this testimony, the court admitted the heater into evidence over petitioner's objection (T. 598).

Weitman also provided important circumstantial evidence of petitioner's guilt. He testified that the school was in the process of adding a fourth floor in March 2003, and that there was scaffolding attached to the rear of the building at the time of the alleged burglary (T. 588-89). There was a staircase running through the scaffolding itself, which afforded workmen access to the fourth floor without their having to enter the school (T. 589). The area of the fourth floor accessible by that staircase connected to the third floor (T. 624-25), and the six radiators were located in classrooms and corridors on that floor (T. 596-97). The burglar alarm system was triggered solely by motion sensors located in the corridors of the school; the exterior doors were not alarmed (T. 608, 610). Weitman also testified that the open door which petitioner had

7

been leaning against when Deserio first accosted him was the exit to an emergency stairwell, the only other door to which was located on the third floor (T. 601). The school's garbage was stored in an area near that door, but there was no dumpster (T. 606).

Aside from Deserio, Russo, Garcia and Weitman, only three other witness testified at trial. Mendel Lowy testified that he was the owner of the Roslyn Savings Visa card which had been recovered during the search of petitioner's person (T. 565), and that he had lost the card on February 8, 2003, in the vicinity of the Far Rockaway Long Island Railroad Station (T. 566-67). Joan Chisholm, who was employed by Centerforce at an alarm monitoring center (T. 573), testified that a burglar alarm was tripped on the third floor of the school at precisely 4:26:28 a.m. on March 5, 2003, and that she had called "911" about one minute later, at 4:27 a.m. (T. 577-79). Finally, a police chemist, Abdul Qureshi, testified that the pipe recovered from petitioner on the night of his arrest contained cocaine residue (T. 661-62).

The defense did not put on a case. Following the close of testimony, Justice Lewis dismissed the charge of criminal possession of stolen property in the fourth degree (N.Y. Penal Law § 165.45[2]) – a charge which related to petitioner's possession of the credit card (T. 711). Thereafter, sometime in the afternoon of November 20, 2003, Justice Lewis charged the jury on the remaining five counts: burglary in the third degree, possession of burglar's tools, petit larceny, criminal possession of stolen property in the fifth degree, and criminal possession of a controlled substance in the seventh degree. The jury was instructed to begin deliberations sometime that afternoon (T. 824), though it is unclear from the record precisely when they were instructed to do so. It is also unclear how long the jury deliberated on that date, although the record indicates that foreperson sent the court a note around 4:45 p.m., requesting further instruction regarding petit larceny, and that the court did not respond to that note until sometime

the next morning (T. 826-27). There is nothing in the record to indicate when the jury was sent home on November 20, 2003, or whether the jury received any instructions before leaving the courthouse.

Around 11:35 a.m. on November 21, 2003, the jury reached a verdict, finding petitioner guilty of all five of the counts charged (T. 830-31). On December 22, 2003, petitioner made a motion to set aside the verdict with respect to all counts except for criminal possession of stolen property, asserting that the evidence was insufficient to establish that petitioner intended to commit a crime or committed a crime inside the school. That motion was denied. On February 3, 2004, after petitioner was arraigned as a second felony offender, Justice Lewis sentenced petitioner to 2½ to 5 years' imprisonment on the burglary charge and to four concurrent terms of one year each on the remaining four counts.

### *The Appeals*

Although petitioner was represented by counsel on appeal, petitioner also elected to file a pro se supplemental brief. The main brief, filed by petitioner's counsel, raised two issues: (1) that petitioner had been denied a fair trial by the trial court's refusal to charge trespass as a lesser included offense of burglary in the third degree and (2) that petitioner was denied fundamental due process when the trial court both failed to give any admonitions before releasing the jury on the evening of November 20, 2003, and failed to respond meaningfully to the note requesting further instructions on petit larceny (Brief for Defendant-Appellant, attached a Ex. A to Ashlyn Dannelly's Declaration in Opposition to the Petition ("Dannelly Declaration") at 9-19). Petitioner's pro se supplemental brief raised four additional points. First, petitioner alleged that his Fourth Amendment rights were violated because Deserio had arrested and searched him without probable cause to believe a crime had even been committed (Pro Se Supplemental Brief

9

for Defendant-Appellant, attached at Ex. D to Dannelly Declaration, at 4-11). Second, petitioner argued that he had been "prejudiced" when, during the grand jury proceedings, the prosecutor falsely implied during her cross examination of petitioner that he had entered the school by climbing ladders to the third floor and had been arrested in possession of 12 bags of crack cocaine (Id. at 12-17). Third, petitioner asserted that the trial judge had erroneously admitted the heater into evidence and that the prosecutor had violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to notify petitioner of the discrepancy in the peddler seals (Id. at 17-25). Finally, petitioner argued that the trial court denied him a fair trial by sending the jury home during deliberations (Id. at 25-36).

On January 17, 2006, the Appellate Division, Second Department, affirmed petitioner's conviction (People v. Archer, 25 A.D.3d 619 (N.Y. App. Div. 2006)). The Second Department specifically addressed only the first points raised both in the main brief and in petitioner's pro se supplemental brief, holding (1) that the hearing court had properly denied the motion to suppress physical evidence because such evidence had been seized in a search incident to a lawful arrest and (2) that the trial court properly refused to charge trespass, since no reasonable view of the evidence permitted the conclusion that petitioner entered the premises for an innocent purpose (Id. at 87). The court did not discuss the second point raised in the main brief, or the three other points raised in the supplemental brief, but stated:

> The defendant's remaining contentions, including those raised in his supplemental pro se brief, are either unpreserved for appellate review or without merit.

(Id.).

Petitioner's counsel sought leave to appeal to the New York Court of Appeals, submitting copies of both the main brief and the supplemental brief. (See Letter to Hon. Judith Kaye from

petitioner commenced filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This petition raises four grounds for relief. First, petitioner argues that Deserio lacked probable cause to believe that a crime had been committed at the time she arrested him and that her seizure and search of his person therefore violated his Fourth Amendment rights (Petition at ¶ 12A). Second, petitioner claims that he was "prejudiced in the Grand Jury Hearing by the prosecution[']s false statements," which suggested to the grand jurors that petitioner had used two ladders to effect entry into the school and had been in possession of a large amount of cocaine when arrested (Id. at ¶ 12B). Third, petitioner implies that the heater introduced at trial was not the one he was holding on March 5, 2003, and that the prosecution denied him due process by introducing this "inadmissible evidence" (Id. at ¶ 12C). Fourth, petitioner argues that the trial court violated his due process right to a fair trial by sending "the deliberating jury home in the midst of their deliberations and failing to respond meaningfully to the jury's inquiries about the charge of petit larceny," which were not addressed until the following day (Id. at ¶ 12D). These four grounds, along with respondent's arguments regarding each, are addressed in the discussion below.

## DISCUSSION

### A.    Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, added the following provision to 28 U.S.C. § 2254 as subsection (d):

11

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This deferential standard of review applies only when the federal claim has been "adjudicated on the merits" by the state court. Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001). If there is no such adjudication, the deferential standard does not apply, and courts "apply the pre-AEDPA standards, and review de novo the state court disposition of the petitioner's federal constitutional claims." Id. (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001)).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir. 2001) (quoting Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999)). However, a "conclusive presumption" that the state court decision "rest[s] on the merits of the federal claim" applies to decisions "fairly appearing to rest primarily on federal law or to be interwoven with federal law . . . [a]bsent a clear and express statement of reliance on a state procedural bar." Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006).

Under subsection (d)(1) – sometimes called the "contrary to" clause – "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S.

362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under subsection (d)(2) – sometimes called the "unreasonable application" clause – "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. However,

> a federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant
> state-court decision applied clearly established federal law
> erroneously or incorrectly. Rather, that application must also be
> unreasonable.

Id. at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

An application for a writ of habeas corpus on behalf of a person in State custody cannot be granted unless "the applicant has exhausted the remedies available in the courts of the State, or . . . there is an absence of available State corrective process; or . . . circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b). To exhaust a claim, a petitioner must present to the state court "both the factual and legal premises of the claim he asserts in federal court," Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), and must give the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court

(including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citing Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) and O'Sullivan, 526 U.S. at 845).

Before enactment of the AEDPA, courts were required to dismiss a state prisoner's federal habeas petition if the prisoner did not exhaust available state remedies as to any of his federal claims. See Rose v. Lundy, 455 U.S. 509, 522 (1989). However, the AEDPA changed the law in this regard, permitting district courts, in their discretion, to deny on the merits habeas petitions containing unexhausted claims – so-called "mixed petitions." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

### Petitioner's First Ground for Habeas Corpus Relief

In his first ground for habeas corpus relief, petitioner asserts that the police violated his Fourth Amendment rights by arresting him without probable cause and that the hearing court should therefore have suppressed the physical evidence recovered from him as fruits of the unlawful arrest. As respondent concedes, this claim is exhausted, having been raised in petitioner's pro se supplemental brief and expressly rejected by the Appellate Division on the merits. However, this court cannot grant relief on this ground because petitioner fully litigated this issue before the State court.

"[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone

14

v. Powell, 428 U.S. 465, 494 (1976). The Second Circuit has identified two circumstances in which a petitioner lacks an opportunity for full and fair litigation. "If the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available." Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977). Alternatively, "even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted." Id.

New York provides adequate corrective procedures to litigate Fourth Amendment claims. See Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (quoting Holmes v. Scully, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)) ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'"). In this case, petitioner took full advantage of these procedures. Petitioner was afforded a pre-trial hearing before a very experienced jurist, former Supreme Court Justice Thomas Demakos. At that hearing, petitioner was not only permitted to exercise his constitutional right to represent himself, see Faretta v. California, 422 U.S. 806 (1975), but was also provided with a court-appointed attorney who was permitted to make objections throughout the hearing (H. 5). Petitioner conducted a thorough cross-examination of the witnesses who appeared at the hearing and, following their testimony, and was permitted to make any arguments he wished in favor of suppression. Although petitioner's principal argument was premised on the mistaken belief that Miranda requires that warnings be read immediately upon arrest and dictates that physical evidence recovered before the warnings be suppressed (H. 46-47), the hearing court did not cut petitioner's argument short (H. 49). Indeed, the prosecutor even attempted to remind defendant of issues which she thought he might have forgotten to address (H. 49).

15

Petitioner does not argue that there was an unconscionable breakdown in the process that the New York courts employed to address his Fourth Amendment claims. "An unconscionable breakdown occurs where there is some sort of "'disruption or obstruction of a state proceeding.'" Capellan, 975 F.2d at 70 (quoting Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)). "To establish such a breakdown," petitioner "would have to prove that no state court conducted a reasoned method of inquiry into the relevant questions of fact and law concerning his Fourth Amendment claim." Jones v. Barkley, No. 99 Civ. 1344, 2004 U.S. Dist. LEXIS 3113, at *16-*17 (N.D.N.Y. Feb. 27, 2004). Petitioner does not even attempt to make such a showing. To the contrary, at the close of the hearing petitioner himself implied that he was satisfied that he had been afforded a full measure of due process, telling JHO Demakos, "I want you as my trial judge" (H. 50-51).

Since petitioner had the opportunity to fully and fairly litigate his Fourth Amendment claim, this court cannot grant habeas corpus relief on the ground that the evidence recovered from him at the scene should have been suppressed as the fruits of an unlawful arrest. See Stone v. Powell, 428 U.S. 465, 494 (1976). Moreover, even if this court could grant such relief, it could not find that the hearing court erred in finding that Deserio had probable cause to arrest petitioner. Upon arriving at the scene around 4:30 a.m., Deserio was aware – from the audible alarm, if not from the radio call she received from Central Command – that someone had tripped the burglar alarm inside the school. Deserio saw petitioner either sitting on or standing astride a bicycle, leaning against an open exit door which was also blocked open with a rock, and holding a relatively new radiator (H. 7, 13, 21-22). When asked what he was doing there, petitioner gave a highly improbable explanation, saying that he had found the door already open and had only "checked to see if anybody was inside" (H. 7). While this explanation might have been plausible

16

if petitioner had, as his sweatshirt suggested, been a security guard, petitioner did not produce identification suggesting that he actually was a security guard. Rather, he produced a welfare benefits card. Moreover, although petitioner told Deserio that he had "removed" the heater "from the trash" (H. 8), the heater was almost new. Taken together, these facts gave Deserio probable cause to believe that a burglary had been committed and that petitioner was the perpetrator.

### Petitioner's Second Ground for Habeas Corpus Relief

As a second ground for habeas corpus relief, petitioner asserts that the prosecution made false statements during the grand jury proceedings, implying that petitioner used ladders to effect entry into the school and had been in possession of a large quantity of crack cocaine at the time of his arrest. Although petitioner raised this same issue in his pro se supplemental brief, respondent argues that this challenge to the grand jury proceedings is unexhausted because petitioner's brief did not alert the Appellate Division to the federal constitutional nature of petitioner's argument. Respondent also argues that, even if petitioner had exhausted it, this ground could not serve as a basis for granting habeas corpus relief.

This court agrees with respondent in both respects. First, the argument set forth as the second point in petitioner's pro se supplemental brief makes no reference to federal constitutional principles. Rather, the headnote specifically cites to section 210.35(5) of New York's Criminal Procedure Law ("C.P.L."), which provides that a grand jury proceeding is defective if it fails to conform to the State statutory requirements set forth in article 190 of the C.P.L. Moreover, the second point of petitioner's pro se supplemental brief cites exclusively to New York State court cases, and makes no reference whatsoever to any federal cases, much less to the federal constitution. Even though some of those State cases cite to federal cases, nothing

17

in petitioner's argument itself alerted the appellate courts to the federal nature of petitioner's claim. See Baldwin, 541 U.S. at 29; Duncan, 513 U.S. at 365-66; O'Sullivan, 526 U.S. at 845.

Even if petitioner had exhausted this ground, however, this court could not grant habeas relief on the basis of defects in the grand jury proceedings. In Lopez v. Riley, 865 F.2d 30 (2d Cir. 1989), the Second Circuit held that claims of deficiencies in grand jury proceedings, such as the presentation by the prosecutor of prejudicial evidence, could not support a collateral attack under 28 U.S.C. § 2254 upon a conviction stemming from the allegedly defective indictment. In so holding, the Second Circuit principally relied on United States v. Mechanik, 475 U.S. 66 (1986), a case decided on direct appeal from a federal conviction. The Mechanik Court reasoned:

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

Id., 475 U.S. at 70. The Second Circuit held that this reasoning also applied to § 2254 habeas cases, stating, "If federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are a fortiori foreclosed in a collateral proceeding brought in federal court." Lopez, 865 F.2d at 32. Therefore, petitioner's second claim is without merit.

### Petitioner's Third Ground for Habeas Corpus Relief

As a third ground for habeas corpus relief, petitioner asserts that the prosecution denied him due process by introducing "inadmissible evidence" – namely, the heater which he was allegedly carrying on the morning of March 5, 2003. Respondent concedes that this ground is

exhausted, in that petitioner made the argument in his supplemental brief and that the Appellate Division denied it on the merits, but argues that the trial court did not err in admitting the heater into evidence. This court agrees with respondent.

In order for an evidentiary error under state law to constitute a due process violation under the federal Constitution, a petitioner must show "that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108 (1976)). Satisfying this standard requires a petitioner to establish that the evidence was (a) erroneously admitted under New York law and (b) "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985). Petitioner cannot meet this standard, for the heater was not inadmissible under New York law.

To be admissible under New York law, "any piece of real evidence must be shown to accurately portray a relevant and material element of the case." People v. Julian, 41 N.Y.2d 340, 342 (1977). Therefore, "[i]n determining whether a proper foundation has been laid for the introduction of real evidence, the accuracy of the object itself is the focus of inquiry, which must be demonstrated by clear and convincing evidence." People v. McGee, 49 N.Y.2d 48, 59 (1979). When proffered real evidence "is purported to be the actual object associated with a crime, . . . [t]he offering party must establish, first, that the evidence is identical to that involved in the crime . . . and, second, that it has not been tampered with." Julian, 41 N.Y.2d at 342-43.

New York courts have long recognized that "[t]he foundation necessary to establish these elements may differ according to the nature of the evidence sought to be admitted." McGee, 49 N.Y.2d at 59. When the evidence is an object which "'possesses unique characteristics or markings' and any material alteration would be readily apparent," the "mere identification of the

19

object by one familiar with [it] . . . will be sufficient" to establish the necessary foundation. Id. at 60 (quoting People v. Connelly, 35 N.Y.2d 171, 174 (1974)), see also Julian, 41 N.Y.2d at 343. When the evidence is a fungible object, such as drugs, and is "not patently identifiable or is capable of being replaced or altered," proof of a complete chain of custody is frequently employed to prove the authenticity of that object. McGee, 49 N.Y.2d at 59; Julian, 41 N.Y.2d at 343. However, "a chain of custody need not be established for a non-fungible item." Jones v. Spitzer, No. 01 Civ. 9754 HBGWG, 2003 WL 1563780, at *37 (S.D.N.Y. Mar. 26, 2003).

The heater at issue in this case was a non-fungible item, possessing unique markings which made it patently identifiable and which made alteration readily apparent. The heater was marked with both a piece of tape, bearing a unique voucher number, and a "peddler seal," bearing yet another unique number. Deserio testified that she was able to identify the heater at issue by these markings, and that the heater was "in the same or substantially the same condition" as it had been at the time of petitioner's arrest (T. 337). This testimony alone may have been sufficient to permit introduction of the heater, but the trial court, in an abundance of caution, forestalled introduction of the heater until the prosecutor adduced evidence to explain the change in peddler seals and Weitman testified concerning his purchase of such heaters. Following that testimony, there was clear and convincing evidence that the heater the prosecution sought to introduce was, in fact, the one recovered from petitioner and that it was in the substantially the same condition as it had been on the night of his arrest. Accordingly, the heater was properly admitted, and this court cannot grant relief upon petitioner's third ground.

### Petitioner's Fourth Ground for Habeas Corpus Relief

As a fourth ground for habeas corpus relief, petitioner argues that the trial court violated his due process right to a fair trial by sending "the deliberating jury home in the midst of their

20

deliberations and failing to respond meaningfully to the jury's inquiries about the charge of petit larceny," which were not addressed until the following day. This ground is somewhat unclear. However, mindful of the obligation to construe pro se submissions liberally, see, e.g., Hughes v. Rowe, 449 U.S. 5, 9 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)), and having thoroughly examined petitioner's appellate briefs and lengthy reply papers in this action, this court interprets this portion of the petition as asserting that the court violated petitioner's due process right to a fair trial by (1) separating the jury, (2) failing to give the admonitions required by N.Y.C.P.L. §§ 310.10 and 270.40, and (3) unreasonably delaying its response to the jurors request for further instructions regarding petit larceny.[4]

Although respondent again concedes that these arguments are exhausted and that the Appellate Division rejected them on the merits, none of these arguments is meritorious. First, to the extent that petitioner is arguing that sequestration of the jury is constitutionally required, petitioner is mistaken. To be sure, there was a time – years before the start of petitioner's trial – when New York's Criminal Procedure Law required sequestration in felony cases. See Peter Preiser, Practice Commentaries to N.Y.C.P.L. § 310.10, 11A McKinney's Consol. Laws of N.Y. 336 (2002). However, sequestration was never constitutionally required. See, e.g., Cheung v. Greiner, No. 02 Civ. 4804 DC, 2003 WL 22801348, at *5 (S.D.N.Y. Nov. 25, 2003) (citing Holt

---

[4]To the extent that the petition can be read as asserting that the trial court's supplemental instruction on petit larceny was incorrect or not "meaningful," this argument would be unexhausted. Petitioner did not contest the substance of the supplemental charge in either of the briefs filed on his behalf on direct appeal. Moreover, since the supplemental charge was correct and any argument to the contrary would be "patently frivolous," this court would, in its discretion, dismiss the unexhausted claim relating to the substance of the supplemental charge. See Wheeler v. Phillips, No. 05 Civ. 4399, 2006 WL 2357973, at *5 (E.D.N.Y. Aug. 15, 2006); see also Wilson v. Goord, No. 00 Civ. 4849, 2004 WL 226149, at *3 (S.D.N.Y. Feb. 6, 2004); Naranjo v. Filion, No. 02 Civ. 5449, 2003 WL 1900867, at *8 (S.D.N.Y. Apr. 16, 2003).

v. United States, 218 U.S. 245, 251 (1910)). Indeed, many states have long permitted separation of the jury, even in capital cases. See Holt, 218 U.S. at 251. By 2001, New York had joined those states, permitting separation of the jury in all cases but mandating that certain procedures be followed before doing so. See N.Y.C.P.L. § 310.10(2), and the Practice Commentary thereto.

Second, to the extent that petitioner is arguing that those statutory procedures were not followed, this court notes that none of those procedures are constitutionally mandated either. For example, section 310.10(2) requires that, before separating the jury, a trial court read the admonitions set forth in N.Y.C.P.L. § 270.40 and instruct the jury not to resume its deliberation until the jury has reassembled. Although no such admonitions or instructions appear on the record in this case, the failure to follow this statutory requirement does not violate due process, provided that the court's instructions to the jury during its preliminary instructions and throughout the trial "adequately conveyed to the jury its function, duties and conduct." See, e.g., People v. Williams, 46 A.D.3d 585, 585 (N.Y. App. Div. 2d Dep't 2007) (quoting People v. Fleming, 270 A.D.2d 498, 498 (N.Y. App. Div. 2d Dep't 2000)). In this case, in which the trial court gave the jury extensive pre-trial instructions – including an admonition not to discuss the case with "spouses or love[d] ones" (T. 319) – the jury was adequately instructed on its function, duties and conduct.

Third, to the extent that petitioner is arguing that the trial court unreasonably delayed in giving supplemental instructions to the jury, the record is silent as to the exact length of the delay. The record indicates only that the jury requested the supplemental instructions late in the day on November 20, 2005 – around 4:45 p.m. (T. 827) – and that the supplemental instructions were given the next morning, sometime before the jury returned a verdict at 11:35 a.m. (T. 830).

22

Since the record does not reflect when the jury was sent home or reported for duty on November 21, 2005, an argument that there was an inordinate delay in responding to the jury's request would be entirely speculative. Moreover, since the jury did not make any further requests or reach a verdict before the supplemental charge was given, it is unclear how petitioner was prejudiced by whatever delay there may have been. In addition, petitioner does not cite to any Supreme Court cases suggesting that the trial court's decision to send the jury home before responding to the jury's note was in any way improper, much less a violation of petitioner's constitutional rights.

## CONCLUSION

For the reasons stated above, the instant petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of the denial of a constitutional right, no certificate of appealability will be granted. See 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

/S/
_____
Allyne R. Ross
United States District Judge

Dated: February 12, 2008
Brooklyn, New York

SERVICE LIST:

Mr. Maynard M. Archer
No. 04-R-0545
Oneida Correctional Facility
P.O. Box 4580
Rome, NY 13442-4580

Ashlyn Dannelly, Esq.
Assistant Attorney General
New York State Department of Law
120 Broadway, 22nd floor
New York, NY 10271